## CLEMENS v. PERRY.

### No. 1547—5864.

Commission of Appeals of Texas, Section A.

June 9, 1932.

Terrell, Davis, McMillan & Hall, of San Antonio, for plaintiff in error.

Dielmann & Forster and L. J. Gittinger, all of San Antonio, for defendant in error.

CRITZ, J.

This suit presents some very unusual and interesting questions, as will later appear. It was filed in the district court of Bexar county, Tex., by Charles Perry, against E. W. Clemens, administrator of the estate of Ernst Knoke, deceased, to establish an alleged claim against Knoke's estate. Trial in the district court resulted in a judgment for Perry, establishing his claim for the sum of $2,700 against Knoke's estate. On appeal this judgment was affirmed by the Court of Civil Appeals, and the administrator brings error.

It appears from the record before us that Clemens is the duly qualified and acting administrator of the estate of Ernst Knoke, deceased, and that prior to the institution of this suit Perry presented to the administrator a claim against the estate for $2,700, which was rejected and the suit followed.

The claim presented to the administrator in substance states:

1. That prior to his death, Ernst Knoke entered into a contract with Perry for services rendered, and to be rendered, in connection with the release of property belonging to the deceased and held by the Alien Property Custodian in Washington, D. C., and for other services.

2. That as evidence of the obligation to pay for said services the deceased, Knoke, executed and delivered to Perry a series of notes all dated July 16, 1921, and payable on demand.

3. That thereafter on September 14, 1923, Knoke, in order to further acknowledge his obligation, and to confirm the same, executed and delivered to Perry an instrument in writing as follows:

"Piedras Negras, Sept. 14, 1923.

"Mr. Herman Clemens,

"Austin, Texas,

"or who may be my administrator at the time.

"Dear Mr. Clemens:

"I hereby acknowledge that my representative, Mr. Charles Perry, San Antonio, Texas, has in every respect fulfilled all of his contracted obligations toward me with reference to the release of my property held by the Alien Property Custodian, in Washington, and I request that you pay to said Charles Perry, or to his heirs, the five per cent commission guaranteed to him on our contract, on all of my property seized by the U. S. Government in Washington, on such assets as are to be released, and on any other valuables without any other order from me and unconditionally.

"In the event I should continue to need the services of Mr. Perry in this matter, he is to receive for such work no additional compensation, except that he is to be reimbursed

268

in accordance with our contract, for cash expenditures, for trips, attorneys fees, telegrams, etc.

"I expressly stipulate that beginning today Mr. Perry is not tied to any particular place of residence, such as San Antonio, and that it is left to him to carry on his activities according to his own judgment, whether in the United States, Mexico, or elsewhere.

"Respectfully, [Signed] Ernst Knoke."

4. That the notes in question are two for $1,000 each, one for $500, and two for $100 each, all dated July 16, 1921, and payable on demand to Perry. It is stated in the claim that there was originally another note for $500, which had been paid, leaving a balance due on the notes of $2,700, with legal interest from date thereof.

5. That the property of Knoke was held in custody by the alien property custodian at Washington, D. C., and before said notes could be renewed Knoke died, during the year 1926. It is then alleged that no administration was taken out on Knoke's estate until recently, and therefore claimant had no way of presenting his claim against the estate until the administrator was duly qualified at the last term of court. It is further alleged that under the Trading with the Enemy Act the statute of limitation does not run against this claim under the facts in such claim, and limitation does not run against such claim under the laws of Texas.

The above claim was presented to the administrator on September 11, 1928, and rejected by him on September 13, 1928, and the suit followed on September 19, 1928.

From the statement we have made it is evident that the claim as filed with the administrator was based on the original contract, the instruments alleged to be notes, and the letter of date September 14, 1923.

After the rejection of the above claim, Perry filed this suit in the district court. The petition, omitting formal parts, alleges in substance:

(a) That on July 16, 1921, Ernst Knoke, now deceased, entered into a contract with Perry whereby Knoke obligated himself to pay Perry a sum equal to 5 per cent. of all property seized by the United States government in Washington, D. C., through the Alien Property Custodian acting under the Trading with the Enemy Act; that under said contract the plaintiff, Perry, was to perform certain services in connection with the recovery and release of said property so seized, and also other services.

(b) That in order to definitely set the figures of the money thus to be paid, Knoke executed a series of promissory notes dated July 16, 1921, amounting to $3,200, of which the sum of $2,700 remains unpaid, and that by reason of the contract and notes Knoke became liable and bound and obligated himself to pay to the plaintiff the sum of money in said notes provided.

(c) The petition then pleads the letter of date September 14, 1923, copied under "3" above of our statement of the claim filed with the administrator, and then pleads that in said letter Ernst Knoke acknowledged that Perry had fulfilled all of his contractual obligation towards him, and directed that the 5 per cent. guaranteed commission be paid plaintiff, which plaintiff alleges is a balance of $2,700.

(d) That the letter was delivered to Perry in consideration of the performance of his part of the services which he had contracted to perform for Knoke, and that said sum is now due and payable, etc.

(e) Perry then pleads the death of Knoke, the probate of his last will in Comal county, Tex., qualification of the administrator, and the presentment and rejection of his claim.

(f) Perry then pleads that all of the property of Ernst Knoke, deceased, at the time the contract was made and at the time the suit was filed, was in the hands of the United States Alien Property Custodian. The amount and value of such property is not alleged:

(g) Perry then finally pleads as follows: "Plaintiff says that said claim as represented by said notes in the sum of $2,700.00, of which $2,000.00 is represented by two notes each in the sum of $1,000.00, payable to Charles Perry on demand; $500.00 by one note, and $200.00 by two notes, each in the sum of $100.00, payable in like manner as said other notes; that said letter or order dated September 14th, 1923, was given in confirmation, recognition and renewal of the obligation represented by said notes for the aggregate sum of $2,700.00; that said sum is still due and unpaid and is due plaintiff, the legal and equitable owner and holder of said notes."

(h) The claim filed with the administrator is attached to the petition as an exhibit and made a part thereof.

The prayer is for the establishment of the claim, together with legal interest, costs of suit, and for general and equitable relief.

By trial amendment Perry pleaded that Knoke was a German citizen and was such during all the times involved in the transactions relating to this suit, and up to the date of his death; but that during all such time he actually resided in the Republic of Mexico, where all the transactions between them occurred. Plaintiff then alleges that prior to the expiration of four years after the execution of the note here sued on, to wit, on July 1, 1925, he made a trip to Mexico to see Knoke, and at such time found him ill mentally and of unsound mind, and that such condition remained unchanged until his death, in

1926. It is then alleged that on account of such fact the statute of limitation did not run against the plaintiff.

The trial amendment then alleges that if plaintiff is mistaken about Knoke's mental condition not suspending the statute of limitation, the letter of date September 14, 1923, above set out, constituted an original and new obligation of Knoke, and was given in full consideration of the performance by Perry of the services contracted, and fully performed, and that by reason of said letter defendant is bound and obligated to pay plaintiff the compensation contracted for in the sum of $2,700, etc.

Perry also filed a supplemental petition which contains a general demurrer and certain special exceptions to the administrator's answer, and then pleads certain matters not necessary to particularly notice here, but which will be considered further along in this opinion.

The answer of the administrator will not be detailed here. It is enough to say that it is sufficient to raise all questions which we later discuss in this opinion.

■ By proper assignments the administrator contends that the contract made the basis of this suit is void, because in violation of certain provisions of the act of Congress known as the "Trading with the Enemy Act" (50 USCA Appendix § 1 et seq.).

The original contract made the basis of this suit was entered into in the Republic of Mexico between Knoke, a German subject, then residing in Mexico, and Perry, also a German subject, residing in the United States and in the state of Texas. The original contract, including the instruments alleged to be notes, was entered into on July 16, 1921, and the letter above quoted was executed on September 14, 1923. The parties were in Mexico at the time the contract and alleged notes and letter were executed. The Joint Resolution of Congress declaring the state of war between the United States and Germany at an end was approved by the President on July 2, 1921 (42 Stat. 105). It thus appears that the status of Knoke and Perry at the time these contracts were signed was not that of alien enemies. In this connection we hold that when the Act of Congress of July 2, 1921, above referred to, was approved by the President, a state of war no longer existed between the United States and Germany in any sense that would make the transaction here involved illegal because in violation of the Trading with the Enemy Act. In other words, at those times these parties had the right to contract with each other in a lawful manner.

The administrator insists that under the decision of the United States Supreme Court in Commercial Trust Company of N. J. v. Miller, 262 U. S. 51, 43 S. Ct. 486, 67 L. Ed. 858, the parties to this suit were alien enemies on July 16, 1921, and September 14, 1923, in such a sense as to make the contracts of those dates illegal for that reason alone. We think that decision can be given no such construction as would render these contracts illegal on the ground that the parties were forbidden to contract under the alien enemy statutes, supra. As we understand the Miller Case, it simply holds that the peace proclamation above mentioned did not operate to terminate or repeal the Trading with the Enemy Act so as to permit the courts to return to claimants property in the hands of the Alien Property Custodian. The instant case involves no such question. Of course, the proclamation did not operate to repeal the act and did not operate to entitle those aliens whose property had been seized under such act to its return. Only the Congress could provide by law for such matters. We think, however, that the proclamation referred to did operate to end the war between this country and Germany, and did operate to relieve German citizens from being alien enemies in such a sense that they could not contract or be contracted with.

The administrator contends that the contract made the basis of this suit is null and void by reason of the provisions of section 20 of the Trading with the Enemy Act. This section reads as follows: "Fees of agents, attorneys, or representatives. No money or other property shall be paid, conveyed, transferred, assigned, or delivered under this Act to any agent, attorney at law or in fact, or representative of any person entitled thereto, unless satisfactory evidence is furnished the President or the court, as the case may be, that the fee of such agent, attorney at law or in fact, or representative for services in connection therewith does not exceed 3 per centum of the value of such money or other property; but nothing in this section shall be construed as fixing such fees at 3 per centum of the value of such money or other property, such 3 per centum being fixed only as the maximum fee that may be allowed or accepted for such services. Any person accepting any fee in excess of such 3 per centum shall, upon conviction thereof, be punished as provided in section 16 hereof. (Oct. 6, 1917, c. 106, § 20, added, March 4, 1923, c. 285, § 2, 42 Stat. 1515; Mar. 10, 1928, c. 167, §.9 [c], 45 Stat.)"

The "historical note" under the above statute as contained in title 50, USCA Appendix, by Edward Thompson & Company and West Publishing Company, shows that the above section was added to the act by Act of Congress March 4, 1923, § 2, and that by Act of Congress March 10, 1928, § 9(c), the phrase "at law or in fact" was added following the word "attorney" wherever it appears in this section.

, In connection with the above it is contended by the administrator that the above statute condemns this contract in toto because the compensation for the services contracted to be performed "in connection with the recovery and release of said property so seized" is fixed at an amount greater than 3 per cent. of the maximum amount allowed by the statute. In support of this assignment the administrator cites Calhoun v. Massie, 253 U. S. 170, 40 S. Ct. 474, 475, 64 L. Ed. 848.

In this connection we here note that Perry's petition alleges: "2. That heretofore, towit, on or about the 16th day of July, A. D. 1921, Ernst Knoke, now deceased, entered into a contract with plaintiff whereby said Ernst Knoke obligated himself to pay to plaintiff a specified sum equal to five per cent of all of the property seized by the United States Government in Washington, D. C., through the office of the Alien Property Custodian, acting under the provisions of the 'Trading with the Enemy Act'; that under said contract the plaintiff, Charles Perry, was to perform certain services in connection with the recovery and release of said property so seized, and services connected with other business matters of the said Ernst Knoke, deceased."

In reply to the above contention made by the administrator, Perry contends that his contract does not violate the act above quoted because he did not perform any services thereunder and did not receive any money from the Alien Property Custodian, and had no contract to receive any such money. Perry further contends that his contract did not contemplate that he had any lien or interest on or in the fund itself in the hands of the Alien Property Custodian, but merely a contract which constituted a personal contract or obligation between the parties thereto, and that such a contract is not condemned by the act. In support of his contention, Perry cites, among others, the following authorities: Nutt v. Knut, 200 U. S. 12, 26 S. Ct. 216, 219, 50 L. Ed. 348; Capital Trust Co. v. Calhoun, 250 U. S. 208, 39 S. Ct. 486, 488, 63 L. Ed. 942.

We think it here expedient to discuss and construe the above-cited authorities. We shall first discuss the authorities cited by Perry.

In Nutt v. Knut, supra, it is shown by the opinion that the suit was originally instituted in the chancery court of Adams county, Miss.; the plaintiff being S. Prentiss Knut, and the defendants being the administrator, heirs, and devisees of Haller Nutt, deceased. The suit was based upon a written contract between the late James W. Denver and the executrix of Haller Nutt, deceased. The contract provided that Denver was to take exclusive charge and control of a certain claim which the executrix had against the United States on account of certain property seized by the officers of the United States government during the Civil War. Denver obligated himself to prosecute the claim before the courts of the United States, the departments of government, and the Congress of the United States, etc. The contract provided that Denver was to receive as compensation for his services a sum equal to 33⅓ per cent. of any amount which should be allowed on the claim, the payment of which was made a lien upon the claim, and upon any draft, money, or evidence of indebtedness which should be issued thereon.

At the same time the above contract was entered into, the executrix executed to Denver a power of attorney, the terms of which authorized him to fully carry out and perform the contract, and do all things necessary or incident thereto.

It is then shown that Knut succeeded to all of Denver's rights under the contract, and as a result of his labors Congress at different times appropriated on account of the Nutt claim the sums of $35,556.17 and $89,999.88. Knut received his due share of the first appropriation, but did not receive his full share of the latter one. He therefore filed suit to recover payment in accordance with the contract for the balance due him on account of the last payment.

Knut amended his petition and asked, in the event of his not being entitled to compensation under the contract, that he have judgment for such sum as his services were reasonably worth, which he alleged to be $30,000.

Upon the first trial in the chancery court judgment was rendered holding the Denver contract illegal and dismissing his cause. On appeal to the Supreme Court of Mississippi (83 Miss. 365, 35 So. 686, 102 Am. St. Rep. 452), this judgment was reversed and judgment rendered adjudging that Knut was entitled to recover according to his contract for 33⅓ per cent. of the amount collected by the administrator, less any payments made. The cause was remanded for an accounting to be taken, and for an order directing the administrator to pay to Knut any balance due under his contract. The accounting was had in the chancery court; Knut being charged with $10,000 paid, and allowed interest. The result was a decree that the plaintiff should receive from the administrator of Nutt's estate the sum of $22,143.30, with 6 per cent. interest. That decree was affirmed (modified as to amount but otherwise affirmed) by the Mississippi Supreme Court. 84 Miss. 465, 36 So. 689. It seems that the Supreme Court of Mississippi declared that the contract did not violate any federal statute. The case was then carried to the Supreme Court of the United States by the administrator.

The opinion in the United States Supreme Court was delivered by Justice Harlan. We

here quote the following from the opinion: "We now come to the merits of the case as affected by § 3477 of the Revised Statutes (U. S. Comp. Stat. 1901, p. 2320 [31 USCA § 203]). That section, as we have seen, declares null and void all transfers and assignments of a claim upon the United States, or of any part or share thereof, or any interest therein, whether absolute or conditional, and whatever may be the consideration thereof, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or of any part or share thereof, unless they are freely made and executed after the allowance of the claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof."

The court then proceeded to hold some of the provisions of the contract null and void, as in violation of the statute above referred to. The portions of the contract creating a lien in favor of the attorney and giving him an interest in the claim itself was then condemned as in violation of the statute prohibiting such transactions unless freely made after the allowance of the claim, the ascertainment of the amount due, and the issuance of the warrant in payment thereof.

The court then proceeded to hold that the balance of the contract could stand, that is, the part evidencing an agreement on the part of Nutt's executrix to pay to the attorney for his services a sum equal to 33⅓ per cent. of the amount allowed on the claim. In this connection the opinion holds that such a claim did not give the attorney any interest or share in the claim itself, nor any interest in the particular money paid over to the claimant by the government, but only established an agreed basis for settlement that might be made after the allowance and payment of the claim. In other words, the opinion holds that this part of the contract simply created a legal obligation on the part of the estate, which if not recognized after the collection of the money could be enforced by suit for the benefit of the attorney, without doing violence to the statute or to the public policy established by its provisions. We here quote the following from the opinion: "It simply created a legal obligation upon the part of the estate, which, if not recognized after the collection of the money, could have been enforced by suit for the benefit of the attorney, without doing violence to the statute or to the public policy established by its provisions. The decree below may then be regarded as only giving effect to the agreement as to the basis upon which the attorney's compensation was to be calculated. It did not assume to give him any lien upon the claim, or any priority in the distribution of the money received by Nutt's personal representative from the United States, nor upon any other money in his hands. Indeed, no lien is asserted by the plaintiff in his pleadings. While the orig-

inal petition asserted his right to be paid in accordance with the contract, the plaintiff claimed, if he could not be paid under the contract, that he be compensated according to the reasonable value of his services." The final paragraph in the opinion states: "Finding in the record no error of law as to any question which may be properly reviewed by this court, the judgment of the state court is affirmed."

A reading of the statute and the opinion discloses that the statute did not attempt to fix or limit the amount of the fee of any attorney who may have served in securing the allowance of the claim or the appropriation by Congress to pay same, but merely makes null and void all transfers and assignments of such claim or any part thereof, etc., unless freely made after the allowance of the claim, the ascertainment of the amount due, and the issuance of the warrant in payment thereof. The United States Supreme Court gave effect to such statute and held that part of the contract in violation thereof null and void; but since the statute contained no provision limiting the amount of attorney fees, that part of the contract was allowed to stand as creating an ordinary contractual debt.

In Capital Trust Company v. Calhoun, supra, it is shown by one Arnold, prior to his death, believing that he had a claim against the United States, entered into a contract with the firm of Calhoun & Sizer, by the terms of which he employed them to undertake the prosecution of a claim against United States. The contract was in writing and provided for a fee of 50 per cent. of any sum of money collected on the claim. Also the contract created a lien on the claim, and any draft or evidence of payment that might be issued in liquidation thereof.

The above firm undertook the prosecution of the claim, and finally, after certain proceedings, Congress passed an act making an appropriation to pay it in the sum of $5,051. This act (Act Cong. March 4, 1915, § 4 [38 Stat. 996]) contained the following provisions: "That no part of the amount of any item appropriated in this bill in excess of twenty per centum thereof shall be paid or delivered to or received by any agent or agents, attorney or attorneys on account of services rendered or advances made in connection with said claim. It shall be unlawful for any agent or agents, attorney or attorneys to exact, collect, withhold or receive any sum which in the aggregate exceeds twenty per centum of the amount of any item appropriated in this bill on account of services rendered or advances made in connection with said claim, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in any sum not exceeding $1,000."

Calhoun succeeded to the rights of the firm, and after the passage of the act making appropriation to pay the claim, requested the United States Treasurer to issue to him a warrant for $1,000, which he recited was to be payable to him on account of services as attorney for Capital Trust Company, administrator for Arnold, deceased; the warrant to be taken and accepted as a full and final release and discharge of any claim against the United States on account of services concerning said claim. A check was issued by the government and mailed to Calhoun in the sum requested in settlement of his claim against the government. This was 20 per cent. of the claim as limited by the above-quoted statute.

The opinion then shows that while the part of the money allowed by Congress on the Arnold claim was still in the hands of the trust company, as administrator, *and there was no other property belonging to the estate of Arnold,* Calhoun presented his claim to the administrator, the trust company, for the balance due him under his contract for 50 per cent. in the sum of $1,504.50, and a lien was asserted by Calhoun on the fund.

The above case originated in a state court of Kentucky. The trial court established the claim for the full amount sued for, and this judgment was affirmed by the Kentucky Court of Appeals. Arnold's Adm'r v. Calhoun, 177 Ky. 518, 197 S. W. 944.

The case finally reached the United States Supreme Court, and Justice McKenna, speaking for that court, reviewed the authorities at great length, among them being Nutt v. Knut, supra, and held that in so far as the judgment of the Kentucky court established a claim to be paid by the administrator out of Arnold's estate was concerned, it could stand, but that the judgment could not be satisfied out of the funds received by the administrator from the United States government. We here quote the following from the opinion:

"If the judgment only establishes a claim against the administrator to be satisfied, not out of the moneys received from the United States but from other assets of the estate, a situation is presented which it was said in Nutt v. Knut, 200 U. S. 13, 21, 50 L. Ed. 348, 353, 26 S. Ct. 216, would not encounter legal objection. In other words, the limitation in the act appropriating the money to 20 per cent. as the amount to be paid to an agent or attorney would have no application or be involved. * * *

"We conclude, therefore, that Calhoun's claim for a balance due as fees cannot be paid out of the moneys appropriated by Congress and now in the hands of the administrator de bonis non, or recognized as having any validity as against that fund. Beyond this we need not go."

A reading of the above case shows that the statute there construed is unlike the statute construed in Nutt v. Knut, supra, in a very important detail. We have already pointed out the effect of that statute, and the fact that it does not attempt to fix or limit the fee to be paid for services rendered thereunder, while the statute construed in Capital Trust Co. v. Arnold, supra, limits the fee to be paid out of the fund to 20 per cent. It is evident from the holding in Capital Trust Co. v. Arnold, supra, that the court construed the statute there involved as a bar to the collection of a greater fee than allowed therein if it had to be paid out of the fund.

In Calhoun v. Massie, supra, cited by the administrator, the Supreme Court of the United States had before it a case in which it is shown by the opinion that the "Omnibus Claims Act" of March 4, 1915, enacted by Congress, made an appropriation to pay certain claims arising out of the Civil War. Among the claims included in the act was one for Bland Massie for $1,900. Section 4 of the act provided:

"That no part of the amount of any item appropriated in this bill in excess of twenty per centum thereof shall be paid or delivered to or received by any agent or agents, attorney or attorneys on account of services rendered or advances made in connection with said claim.

"It shall be unlawful for any agent or agents, attorney or attorneys to exact, collect, withhold or receive any sum which in the aggregate exceeds twenty per centum of the amount of any item appropriated in this bill on account of services rendered or advances made in connection with said claim, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in any sum not exceeding $1,000."

The opinion shows that Massie had executed a fee agreement as follows: "Fee Agreement.—This agreement witnesseth: That I, Bland Massie, of Tyro, Nelson county, Virginia, have employed C. C. Calhoun, of Washington, D. C., as my attorney to prosecute my claim against the government of the United States for property taken by the federal forces during the late Civil War, and in consideration of his professional services in the prosecution of said claim I hereby agree and bind my heirs and legal representatives, to pay him, his heirs or legal representatives as a fee a sum equal to 50 per cent. of the amount which may be collected upon said claim, said fee to be a lien on any warrant which may be issued in payment of said claim."

Calhoun was instrumental in securing the allowance of the above claim by the Court of

Claims and the appropriation by Congress to pay the same.

The government paid the above $1,900 claim by means of two warrants, one for $380, being 20 per cent. thereof, to Calhoun, and the other $1,520, being 80 per cent. thereof, to Massie. Calhoun demanded of Massie a further sum of $570, equal to 30 per cent. of the claim. In other words, Calhoun demanded of Massie an additional sum sufficient to make his fee 50 per cent. of the claim as provided in the contract between them. Massie refused payment, and Calhoun brought suit in a state court of Virginia to recover the $570. The trial court held that Calhoun was limited to the recovery provided by the statute, and that-he having been paid the statutory sum no further recovery could be had. The Supreme Court of Appeals of Virginia affirmed this judgment, 123 Va. 673, 97 S. E. 576, and Calhoun brought the case before the United States Supreme Court on writ of certiorari, 249 U. S. 596, 39 S. Ct. 289, 63 L. Ed. 794. On final hearing in the United States Supreme Court, the judgment of the state court was affirmed, and in the opinion, which is by Justice Brandeis, it is held (we quote from the syllabus): "2. An existing contract for the payment to an attorney for professional services to be rendered in the prosecution of a Civil War claim against the United States of a sum equal to 50 per cent of whatever might be collected was invalidated by the provision of the Omnibus Claims Act of March 4, 1915, which, after making an appropriation for payment of such claim, made it unlawful for any attorney to exact, collect, withhold, or receive any sum which, in the aggregate, exceeds 20 per cent of the amount of any item appropriated in that act, on account of services rendered or advances made in connection with said claim, any contract to the contrary notwithstanding."

A reading of the act involved in Calhoun v. Massie shows that the statute there involved did not invalidate the entire contract when the fee provided for exceeded the 20 per cent. allowed therein, but simply made it unlawful for an attorney to "exact, collect, withhold or receive any sum which in the aggregate exceeds twenty per centum of the amount * * * any contract to the contrary notwithstanding." Also the record shows that the government recognized the contract up to the limit of fee allowed thereby, and paid such amount to the attorney, and the United States Supreme Court refused a judgment for any further amount.

■ We now come to decide what amount, if any, Perry is entitled to establish his claim for.

An examination of this entire record leads us to the inevitable conclusion that the maximum amount that Perry is entitled to under the express terms of his contract (we are not here considering the effect of section 20, supra, of the Trading with the Enemy Act) is 5 per cent. of the value of the property actually coming into the hands of the administrator, and that such sum is not due until such money or property is actually received by the administrator. This is evident from the entire transaction. In this connection we hold that the original contract of date July 16, 1921, the instruments alleged to be notes, but which are not notes, of the same date, executed as a part of the same transaction, and the letter of September 14, 1923, all demonstrate the correctness of this conclusion. We have already quoted the letter of September 14, 1923. The alleged notes are not notes at all, but mere orders on Herman Clemens to pay the amounts named therein, except two of such instruments dated July 10, 1921, are in note form, and are for $100 each, and due on demand. The contract executed with the orders contains, among others, the following provisions:

"(1) We hereby authorize you to collect and secure the release of our claim to inheritance from the estate of our uncle, George Knoke, and of our aunt, Emilie Knoke, nee Florge, both deceased at New Braunfels, Texas, U. S. A., according to our instructions and wishes.

"(2) We bear all of your legitimate expenses for traveling to New Braunfels, Austin, Piedras Negras, or elsewhere, furthermore all expenses in behalf of our matters as well as attorneys fees.

"(3) On all moneys recovered through your assistance as well as on other returned valuables, we will pay you a commission of 5% (five).

"(4) On all moneys or valuables which Mr. Herman Clemens is at present seeking to retain, under whatever pretext, such as claims to the estate of Mrs. Emilie Knoke, or any valuables, which according to the report of Mr. Herman Clemens covering the years 1913 to 1920 are obscure and may not be tangible for the moment, but which may be recovered through your intervention, we will pay you in addition to the agreed 5%, provided in clause (3) above, an additional commission of 10%.

"(5) Your commissions are due you as soon as the valuables concerned are placed at our disposal in any manner whatever, no matter of what character these valuables may be, whether cash money or securities."

Perry contends that the letter of September 14, 1923, has legal effect to confirm, recognize, and renew the instruments he calls notes. The letter does not expressly mention such instruments, and its legal effect is to confirm the original contract, which seems to have consisted of the contract and orders of July 16, 1921. This is evident be-

cause the original contract called for 5 per cent., and the letter only confirms 5 per cent. It is therefore evident that the orders Perry calls notes are a mere estimate, and do not finally determine the amount due or the time when due, but the amount due, and when due must depend on the amount the administrator recovers, and the time of such recovery.

What we have already said brings us to the point where we must determine what effect section 20, supra, has on the right and amount of recovery in the case at bar.

When we further examine the entire contract in the light of what has already been said, we find that it provides for a fee of 5 per cent. Such fee is for services rendered in connection with the release of property belonging to deceased and held by the Alien Property Custodian, and for other services. There is no agreement as to what part of the fee is for services in connection with property held by the Custodian, and what part is for other services. It follows that we must treat the entire fee as pertaining to services in connection with the recovery of property held by the Alien Property Custodian.

We have already quoted section 20 of the Trading with the Enemy Act. By its terms it provides that: "No money or other property shall be paid, conveyed, * * * under this Act to any agent, attorney at law, * * * of any person entitled thereto, unless satisfactory evidence is furnished * * * that the fee * * * for services in connection therewith does not exceed 3 per centum of the value of such money or other property." The statute then proceeds to prescribe a criminal penalty on any person accepting a fee in excess of the maximum allowed therein.

It is evident that the terms of the above act apply to the instant contract. It certainly applies to all contracts to pay a fee for services to recover property in the hands of the Alien Property Custodian, by virtue of the Trading with the Enemy Act. We think, however, that the statute does not have effect to denounce the entire contract, but only so much of the fee provided as exceeds the statutory maximum.

We do not deem it necessary for us to decide whether the 2 per cent. excess can be allowed as a claim against the administrator to be paid out of property other than that recovered and to be recovered from the Alien Property Custodian. There is no such property, and therefore this case involves no such issue.

Finally, Perry contends that since the trial court and Court of Civil Appeals have found as a fact, and also as a matter of law, that he did not perform any services under the Trading with the Enemy Act, and did not contract to do so, such act has no application to this case, and its provisions cannot operate to bar the enforcement of this claim. We have already stated the terms of the contract, and in our opinion the contract conclusively shows that Perry was employed "with reference to the release of my property held by the Alien Property Custodian in Washington," and the compensation is fixed at "five per cent. commission guaranteed to him, on our contract, on all property seized by the .U. S. Government in Washington, on such assets as are to be released," etc. The contract by its express language brings itself under the act.

We recommend that the judgments of the Court of Civil Appeals and district court be both reversed, and the cause remanded to the district court for a new trial.

CURETON, C. J.

Judgments of the Court of Civil Appeals and district court are both reversed, and cause remanded, as recommended by the Commission of Appeals.

We approve the holdings of the Commission of Appeals on the questions discussed in its opinion.